**Everard GENIUS, Petitioner, Appellant,**

v.

**Peter PEPE, Jr., Respondent, Appellee.**

No. 97–2427.

United States Court of Appeals, First Circuit.

Heard April 7, 1998.

Decided July 1, 1998.

---

Robert L. Sheketoff with whom Sheketoff & Homan was on brief for petitioner.

Gregory I. Massing, Assistant Attorney General, Criminal Bureau, Appellate Division, with whom Scott Harshbarger, Attorney General, was on brief for respondent.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

This is an appeal by Everard Genius from the district court's order denying Genius's petition for a writ of habeas corpus. Genius was convicted of first degree murder in state court in 1980 and is currently serving a life sentence for that crime. Relying primarily on the well-reasoned decision of the district court, we sustain the denial of the writ. However, in light of the unusual history of the case, we set forth a brief summary of the facts and our reasons for affirmance.

The facts, recounted in numerous opinions cited hereafter, can be briefly stated. In 1979, Genius—who was married at the time—stabbed to death his paramour, Lillie Mae Nesbitt. He claimed that she had threatened him with a gun and that he recalled nothing thereafter. He also claimed that he was compelled to commit the murder by a voodoo curse that his wife had placed upon him. There is no dispute that Genius did in fact kill Nesbitt; the only issue is whether an insanity defense should have been pursued more vigorously.

Prior to the state court trial, Genius was examined by Dr. Dennis Koson, a forensic psychiatrist employed by McLean Hospital with responsibilities at Bridgewater State Hospital. Koson found Genius incompetent to stand trial due to "situational depression of severe proportions" resulting from "incarceration in the jail and the charges lodged against him." Genius was then treated for approximately two months with antidepressant medication. In May 1980, Koson examined Genius again and found the depression had lifted and that Genius was competent; Koson found "no evidence of psychosis" and opined that Genius was not insane at the time of the murder.

At almost the same time but prior to Genius's trial, the Massachusetts Supreme Judicial Court recognized a diminished capacity "defense" to first degree murder charges. *Commonwealth v. Gould*, 380 Mass. 672, 405 N.E.2d 927, 932–35 (1980). Under *Gould*, even a person who is not insane under Massachusetts law might still argue that he did not have the capacity to form the specific intent needed for a conviction of first degree murder, which in Massachusetts requires premeditation or extreme cruelty or atrocity. *See* Mass. Gen. Laws ch. 265, § 1. Even without either element, the defendant might still be found guilty of second degree murder so long as the murder was intentional.

Genius's counsel, Reuben Dawkins, determined to build his defense on the *Gould* case. At trial, he called Dr. Koson who testified that while Genius was not insane at the time of the murder, he was "extremely agitated to

the point of losing touch with the enormity of what he was doing." However, consistent with his own prior opinion, Koson admitted that nothing suggested that Genius was "mentally ill" at the time of the crime ·as required for insanity under Massachusetts law.[1] After several hours of deliberation, the jurors asked for further instructions on extreme atrocity and after several days of deliberation, returned a verdict of first degree murder. Genius's conviction was affirmed on direct appeal. *See Commonwealth v. Genius,* 387 Mass. 695, 442 N.E.2d 1157 (1982).

Two years later, in 1984, Genius filed a *pro se* motion for a new trial and in that connection was examined—although only years later, in 1987—by another psychiatrist, Dr. Daniel Weiss. Weiss said that Genius's belief in voodoo constituted a delusion that deprived Genius of self-control and meant that he "could not be held to be criminally responsible." In a supplemental opinion, Weiss said that Genius's amnesia might indicate that he was suffering from a mental illness or defect after the murder. Treating this as newly discovered evidence, the state Superior Court judge granted Genius a new trial and was promptly reversed by the Massachusetts Supreme Judicial Court. *See Commonwealth v. Genius,* 402 Mass. 711, 524 N.E.2d 1349 (1988).

Having exhausted state remedies, Genius then turned to the federal district court to pursue his constitutional claim that Dawkins had rendered ineffective assistance of counsel in the original state court trial by failing to pursue adequately the possibility of an insanity defense. Under the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, a criminal defendant is entitled to a competent defense counsel, although counsel's judgments in formulating the defense strategy are entitled to substantial deference. *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In response to Genius's initial habeas corpus petition, the state moved to dismiss on procedural grounds only, arguing that Genius had waived his objection by failing earlier to raise his constitutional claim.

In response, Judge Keeton dismissed the petition *on the merits,* determining that Genius's allegations, even if true, did not show that Dawkins had rendered ineffective assistance of counsel. At the time of this decision, it appears that the state had not yet made any effort to develop the record to show what other psychiatric evaluations had been done. Thus, when Genius appealed from this original denial of the petition, this court knew little more than the facts already recounted above concerning the defense that Dawkins had mounted at trial and the background of his decision. On that record, this court reversed the district court. *See Genius v. Pepe,* 50 F.3d 60 (1st Cir.1995).

In a brief opinion, this court pointed out that although Koson had rejected Genius's claim of mental disorder, Weiss had now opined that Genius had been or could have been insane. Dawkins might, under state law, have obtained an independent psychiatric examination paid for by the Commonwealth, and the report would have been privileged and unavailable to the Commonwealth. Mass. Gen. Laws ch. 261, § 27C(4), ch. 233 § 20B. Given that Genius had admittedly been incompetent to stand trial for several months and that insanity would offer a complete defense, this court said that Dawkins had provided incompetent representation in failing to pursue the insanity issue.

As soon as the decision was rendered, the state filed a petition for rehearing, pointing out that the record had not been adequately developed to show the context in which Dawkins had made his decision. This court then entered an order denying rehearing but saying that the state was free to seek to offer additional evidence in the district court. On remand, Judge Keeton recused himself, and the matter was transferred to Judge Stearns who proceeded to develop the record. After doing so, Judge Stearns entered the order

1. In *Commonwealth v. McHoul,* 352 Mass. 544, 226 N.E.2d 556, 557–58 (1967), the Supreme Judicial Court adopted the Model Penal Code's formulation that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality ... of his conduct or to conform his conduct to the requirements of law."

now under review, rejecting Genius's claim that he had been incompetently represented and denying his petition for the writ. This appeal followed.

Judge Stearns's thirty-one page opinion makes clear that Genius was in fact evaluated *six* times before trial. Two of the reports have been lost, and neither side claims to know exactly what they said, although there is some reason to believe that they did not say that Genius was insane at the time of the murder. Of the four reports that are in the record, prepared by three different psychiatrists, none suggests that at the time of the crime Genius had a mental disease or defect that might have afforded him an insanity defense.

Genius was first examined after his arraignment on July 16, 1979 by the court clinic psychiatrist, but that report is missing. In December 1979, Genius was examined by Dr. Emil Pawlowski, the Director of the Suffolk County Superior Court Psychiatric Clinic, who found him competent to stand trial, stating that he was "moderately depressed," but that "there was no suggestion of psychosis or organic brain disorder." In the same month, the court ordered another evaluation by the court clinic psychiatrist, but this report is also missing.

In February 1980, Dr. Koson examined Genius and found him incompetent to stand trial, for reasons already recounted, and in April 1980, Genius was again examined by Dr. Robert Fein, the Deputy Medical Director at Bridgewater. Fein found Genius now competent to stand trial. In May 1980, Koson examined Genius again and gave the opinion already described that there was no evidence of psychosis and that Genius was not insane at the time of the murder but may have been overcome by passion and a loss of control.

Judge Stearns also undertook a review of Dr. Weiss's several full opinions, which had not been before this court at the time of the original appeal. Judge Stearns concluded that Weiss's opinions provided no legitimate basis for doubting Genius's sanity at the time of the trial. Weiss's original report made no mention of a mental disease or defect—an absolute precondition under Massachusetts law for the insanity defense—and his subsequent report equated a belief in voodoo with mental disorder on the ground that it was an irrational belief. Judge Stearns pointed out that this approach would render insane vast numbers of Americans including, merely to pick an example, the millions who believe in astrology.

On this second appeal, Genius does not challenge the district court's right to supplement the record, in accordance with our order on rehearing, but does urge that even on this record the district court erred in concluding that Dawkins had rendered competent service. Genius repeats that it would have cost nothing for Dawkins to have obtained the additional psychiatric report provided under state law. Since Genius had been found temporarily incompetent to stand trial and had at least some worrying symptoms (for example, alleged amnesia), Genius argues that his defense counsel had nothing to lose and everything to gain by seeking the psychiatric examination that might have given some purchase for an insanity defense.

The argument is not frivolous, but neither is it persuasive. In many criminal cases, there are (in the abstract) numerous possible defenses. Even when there is no need for an expert or the costs of an expert are borne by the state, pursuing any line of inquiry involves some use of time and distracts in some degree from other possible defenses that might be pursued. As the Eleventh Circuit has said, "counsel ... is not required to pursue every path until it bears fruit or until all available hope withers." *Solomon v. Kemp,* 735 F.2d 395, 402 (11th Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985) (citation omitted).

In short, everything depends on context. Here, the context is that Genius had been examined by three psychiatrists whose reports are available to us and none of them suggested that there was any indication of mental disease or defect at the time of the crime. The only asserted expert evidence of Genius's insanity at the time of the crime was prepared seven years afterwards; without adopting the district court's description of Weiss's analysis as "addled," we agree that it

provides very little basis even now for thinking that Genius had an insanity defense available. By contrast, Koson's testimony did supply some hope for the diminished capacity defense, while an insanity defense would have involved impeaching Koson's claim that Genius was not insane at the time of the crime.[2]

Against this background, we have no hesitation in concluding that on a fully developed record, there is no showing that Dawkins provided incompetent defense. And in fairness to Dawkins, it is worth recording that the state Superior Court judge who granted the motion for a new trial on grounds of newly discovered evidence also wrote: "I ... find it hard to imagine what else Mr. Dawkins could legitimately do in this type of case. He comported himself as a talented advocate. He did not fail to protect his client at any time during the trial."

*Affirmed.*

**2.** Genius also says briefly the trial judge erred in his instruction to the jury on the *Gould* defense, and that Dawkins failed to object. This has little to do with counsel's decision in choosing to pursue a diminished capacity defense instead of an insanity defense, and the claim is not seriously offered as independent proof of incompetence.